# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL ACTION NO. 3:12-cv-00336-MOC-DSC

_____

STEVE COOKSEY,                                )
                                              )
                Plaintiff,        )
                                              )
      v.                              )
                                              )
MICHELLE FUTRELL, et al.,                     )
                                              )
            Defendants.          )
_____ )

---

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

---

Jeff Rowes*
Paul M. Sherman*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Telephone: (703) 682-9320
Fax: (703) 682-9321
E-mail: jrowes@ij.org; psherman@ij.org
*Admitted Pro Hac Vice

Attorneys for Plaintiff

Robert W. Shaw (N.C. State Bar No. 32923)
WILLIAMS MULLEN
P.O. Box 1000
Raleigh, NC 27602
Telephone: (919) 981-4310
Fax: (919) 981-4300
E-mail: rshaw@williamsmullen.com

Local Counsel for Plaintiff

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .................................................................................................. 1

I.   PLAINTIFF HAS STANDING AND HIS CLAIMS ARE RIPE. ................................ 1

   A.   Standing Is Based on the Board's Three-Month Investigation and
        Warning That It Will Continue Monitoring Plaintiff Cooksey's Speech. ............ 2

   B.   The Board's Actions Have Caused Plaintiff Cooksey to Suffer an Objectively
        Reasonable Chilling of His Speech. .......................................................... 4

   C.   *Kemler* Is Inapposite. ........................................................................... 6

   D.   Plaintiff Cooksey's Claims Are Ripe Because There Is a Clear Legal Dispute
        and He Was Not Required to Exhaust Administrative Remedies. ..................... 7

II.  PLAINTIFF COOKSEY IS LIKELY TO SUCCEED ON THE MERITS
     BECAUSE THE BOARD HAS NOT CARRIED ITS BURDEN UNDER THE
     FIRST AMENDMENT. ......................................................................... 11

   A.   The Board Willfully Ignores Supreme Court Authority in Arguing That the
        First Amendment Does Not Apply. ......................................................... 12

   B.   The Remaining Cases the Board Cites Are Either Bad Law
        or Distinguishable. ............................................................................ 14

   C.   The Board Fails to Address, Much Less Rebut, the Following First
        Amendment Arguments Establishing a Likelihood of Success on
        the Merits. ...................................................................................... 17

III. THE REMAINING PRELIMINARY-INJUNCTION FACTORS FAVOR
     PLAINTIFF COOKSEY. ...................................................................... 19

CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Accountant's Soc'y of Va. v. Bowman,* 860 F.2d 602 (4th Cir. 1988) ............................11

*Arch Mineral Corp. v. Babbit,* 104 F.3d 660 (4th Cir. 1997) ........................................10

*Benham v. City of Charlotte,* 635 F.3d 129 (4th Cir. 2011) ...........................................4

*Blankenship v. Manchin,* 471 F.3d 523 (4th Cir. 2006)....................................................5

*Brown v. Entm't Merchants Ass'n,* 131 S. Ct. 2729 (2011)............................................18

*Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520 (1993)........................18

*Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474 (4th Cir. 2005)........4, 5

*Cf. Sackett v. EPA,* 132 S. Ct. 1367 (2012) ....................................................................9

*Edenfield v. Fane,* 507 U.S. 761 (1993) ........................................................................14

*Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123 (1992)........................................18

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418 (2006) ...................14

*Greater New Orleans Broad. Ass'n v. United States,* 527 U.S. 173 (1999).....................18

*Harrell v. Fla. Bar,* 608 F.3d 1241 (11th Cir. 2010) ........................................................4

*Holder v. Humanitarian Law Project,* 130 S. Ct. 2705 (2010) ......................................13

*Kemler v. Poston,* 108 F. Supp. 2d 529 (E.D. Va. 2000)..................................................6

*Locke v. Shore,* 634 F.3d 1185 (11th Cir. 2011)............................................................16

*Lowe v. SEC,* 472 U.S. 181 (1985) ................................................................................12

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ......................................................4

*Miller v. Brown,* 462 F.3d 312 (4th Cir. 2006) ..........................................................8, 11

*Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology (NAAP),* 228 F.3d 1043 (9th Cir. 2000)...............................................................................................15

Case 3:12-cv-00336-MOC-DSC   Document 18   Filed 07/13/12   Page 3 of 27

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803 (2003)...........................................9

*Newsom v. Albermarle Cnty Sch. Bd.,* 354 F.3d 249 (4th Cir. 2003) ................................9

*Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447 (1978)................................................14

*Patsy v. Bd. of Regents,* 457 U.S. 496 (1982) ........................................................8

*S.C. Citizens for Life, Inc. v. Krawcheck,* 301 F. App'x 218 (4th Cir. 2008)..............................11

*Sorrell v. IMS Health, Inc.,* 131 S. Ct. 2653 (2011) ....................................................13

*Steffel v. Thompson,* 415 U.S. 452 ( 1974) ..............................................................5

*The Int'l Acad. of Oral Med. and Toxicology v. The North Carolina State Board of Dental Examiners,* 451 F. Supp. 2d 746 (E.D.N.C. 2006) ...........................................................8

*Thomas v. Collins,* 323 U.S. 516 (1945)................................................................12

*Turner Broad. Sys. v. FCC,* 512 U.S. 622 (1994)........................................................13

*Underhill Associates v. Bradshaw,* 674 F.2d 293 (4th Cir. 1982)................................15

*United States v. Alvarez,* No. 11-210, 2012 U.S. LEXIS 4879 ....................................18

*United States v. O'Brien,* 391 U.S. 367 ( 1968) ..............................................13

*Va. Soc'y for Human Life, Inc. v Fed. Election Comm'n,* 263 F.3d 379 (4th Cir. 2001) ..........5, 11

*Westmoreland Coal Co., Inc. v. Int'l Union, United Mine Workers of Am.,* 910 F.2d 130 (4th Cir. 1990) ................................................................19

## RULES AND STATUTES

N.C. Gen. Stat. § 90-18(c) ................................................................17

N.C. Gen. Stat. § 84-4................................................................17

N.C. Gen. Stat. § 90-352................................................................10

N.C. Gen. Stat. § 90-356................................................................2

N.C. Gen. Stat. § 90-357................................................................16

N.C. Gen. Stat. §§ 90-365(5) ................................................................7

Case 3:12-cv-00336-MOC-DSC   Document 18   Filed 07/13/12   Page 4 of 27

N.C. Gen. Stat. § 90-368(6) ........................................................................................16, 17

21 N.C. Admin. Code § 17.0116 ............................................................................................7

1991 N.C. Adv. Legis. Serv. 668 (LexisNexis)............................................................19

## OTHER AUTHORITIES

Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-altering Utterances," and the Uncharted Zones,* 90 CORNELL L. REV. 1277 (2005)...13

v

**INTRODUCTION**

Defendant members of the North Carolina Board of Dietetics/Nutrition ("the Board") assert that, notwithstanding their content-based censorship of Plaintiff Cooksey's speech, Plaintiff Cooksey's claims are nonjusticiable. There is no merit to this assertion. Nor is there merit to the Board's argument that this censorship does not implicate the First Amendment, an argument that does not even acknowledge, let alone refute, the controlling U.S. Supreme Court precedent cited in Plaintiff Cooksey's brief in support of his Motion for Preliminary Injunction. As explained below, Plaintiff Cooksey's claims are plainly justiciable, he has demonstrated a likelihood of success on the merits, and the remaining preliminary-injunction factors all weigh in his favor.

**I.  PLAINTIFF HAS STANDING AND HIS CLAIMS ARE RIPE.**

The Board argues that Plaintiff Cooksey's claims are not justiciable. According to the Board, he has no standing, nor are his claims ripe, despite the fact that:

- The Board argues in its response that North Carolina's dietitian-licensing law was designed to curtail "advice on . . . diets," Defs.' Mem of Law in Opp'n to Pl.'s Mot. for Prelim. Inj. ("Resp. Br.") at 18;

- The Board investigated Plaintiff Cooksey for offering advice on diet, Complaint ("Compl.") ¶ 63;

- The Board's executive director and various Defendants personally informed Plaintiff Cooksey that his advice on diet violates the law, Decl. of Steven Cooksey in Supp. of Pl.'s Mot. for Prelim. Inj. ("Cooksey Decl.") ¶¶ 15–22; Compl. ¶¶ 60–89;

- Plaintiff Cooksey actually stopped offering advice on diet as a result of the Board's statements, Cooksey Decl. ¶¶ 23–25; Compl. ¶¶ 101–03; and

- The Board informed Plaintiff Cooksey, in a letter that was also sent to the Board's counsel, that it would monitor Plaintiff Cooksey to ensure his continued compliance. Supplemental Decl. of Steve Cooksey in Supp. of Pl.'s Mot. for Prelim. Inj. ("Cooksey Supp. Decl."), Ex. A; Compl. ¶ 105.

1

As explained below, the facts supporting standing are far broader than acknowledged by the Board, Plaintiff Cooksey plainly has standing under these facts, and the district court decision upon which the Board relies is inapposite. Similarly, Plaintiff Cooksey's claims are ripe because there is a clear legal controversy about whether the First Amendment applies to his speech.

### A. Standing Is Based on the Board's Three-Month Investigation and Warning That It Will Continue Monitoring Plaintiff Cooksey's Speech.

The Board's standing argument fails because the Board does not acknowledge the range of facts that support standing. The Board argues that Plaintiff Cooksey suffered no injury at its hands because he "hinges his First Amendment claims on the 'red-pen' review provided to him in an email by Charla Burill," who is the Board's executive director. Resp. Br. at 8. The Board argues that "the comments provided to him were in no way any official act of the Board," *id.*, emphasizing that the email from the Executive Director accompanying the red-pen review was couched in terms such as "areas of concern" and the phrase "should you agree with our comments, we would ask that you make any necessary changes to your site." *Id.*

The simple fact is that the red-pen review alone would support standing—the Executive Director's email notwithstanding—but this Court does not ultimately have to answer whether the red-pen review would be enough because the factual basis for standing is far broader. Plaintiff Cooksey's standing is premised on the totality of the facts surrounding the three-month State Board investigation and the Board's continued monitoring of his speech.

Around January 12, 2012, pursuant to its express statutory authority, the Board opened an official investigation into Plaintiff Cooksey on the basis of a complaint lodged by someone who heard Plaintiff Cooksey express an opinion about diet at a church seminar. Compl. ¶ 63; N.C. Gen. Stat. § 90-356 ("The Board shall . . . [c]onduct investigations . . . to enforce this Article"). As part of that official Board investigation, the Executive Director and various Defendants who

2

compose the Board's Complaint Committee chose to examine Plaintiff Cooksey's online writings. Compl. ¶¶ 71–89.[1] The Executive Director and those Defendants produced the red-pen review. *Id.* at Ex. 1. In the red-pen review, the Executive Director and various Defendants included unequivocal legal conclusions about specific statements by Plaintiff Cooksey:

- "you need a license to provide this service," Compl., Ex. 1 at 1;

- "Here you are giving this person advice based on what she has said to you. . . . Counseling/advising requires a license," *id.*;

- "Assessing and advising—requires a license," *id.* at 2;

- "you guided her (for her friend) to your meal plan—indirectly you conducted an assessment and provided advice/nutritional counseling," *id.*;

- "Advising," *id.* at 3;

- "You should not be addressing diabetic's [sic] specific questions. You are no longer just providing information when you do this, you are assessing and counseling, both of which require a license," *id.* at 5;

- "When helping her with this issue you were assessing and advising—these activities require a license," *id.* at 6;

- "Again, what does this communicate to the public? <u>Assessing</u>," *id.*;

- "You are now providing diabetic counseling, which requires a <u>license</u>," *id.* at 11;

- "you cannot work one-on-one with individuals." *Id.* at 14.

The Executive Director and various Defendants also drew giant X's through various sections of Plaintiff Cooksey's website. *Id.* at 14–15; *see also* Cooksey Decl. ¶¶ 15–22. Based on the conclusions of the Executive Director and various Defendants, Plaintiff Cooksey stopped expressing opinions in the form of dietary advice. Compl. ¶¶ 68–69, 98–105; *see also* Cooksey Decl. ¶¶ 23–25.

---

[1] There is no question that various Defendants on the Complaint Committee were acting in their official capacities alongside the Executive Director. The Executive Director's emails to Plaintiff Cooksey make it clear that she and the Defendants on the Complaint Committee worked together on the red-pen review. *See* Compl. Exs. 2, 4.

3

The Board's official investigation of Plaintiff Cooksey ended with an April 9, 2012 letter to Plaintiff Cooksey on Board letterhead from the Executive Director—and copied to the Board's counsel—stating that, because Plaintiff Cooksey has "remained in substantial compliance with the requirements of Article 25, Chapter 90 of the North Carolina General Statutes," the "*Board* is closing this complaint." Cooksey Supp. Decl. Ex. A (emphasis added); *see also* Compl. ¶ 105; Cooksey Decl. ¶ 23. In other words, it is not that the Board found him to have been in compliance from the outset, but instead that the Board found that he came into compliance as a result of the self-censorship that followed the red-pen review. The letter stating the official position of the Board closed with a warning that "the *Board* reserves the right to continue to monitor this situation." Cooksey Supp. Decl. Ex. A (emphasis added). Because the Board has informed him that he is personally subject to ongoing monitoring, Plaintiff Cooksey continues to refrain from expressing opinions in the form of dietary advice. Cooksey Decl. ¶ 23.

### B. The Board's Actions Have Caused Plaintiff Cooksey to Suffer an Objectively Reasonable Chilling of His Speech.

To establish standing, Plaintiff Cooksey must allege an injury-in-fact that is: (1) concrete and particularized, not speculative; (2) traceable to Defendants' conduct; and (3) judicially redressable. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In the First Amendment context, a plaintiff suffers an injury-in-fact if his or her speech is chilled. *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (a "cognizable injury under the First Amendment is self-censorship, which occurs when a claimant 'is chilled from exercising her right to free expression.'") (citing *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010)). To create a First Amendment injury premised on chilling, the self-censorship must be objectively reasonable, meaning that the challenged government action would "deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of*

*George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). Thus, for Plaintiff Cooksey to establish standing, the allegations of the Complaint and supplementary evidence must show that he suffered a concrete and particularized chilling effect—and that it was objectively reasonable for his speech to be chilled—due to the Board's actions.

Under well-established precedent, Plaintiff Cooksey has alleged an objectively reasonable basis for asserting that his speech has been chilled. This is not a close call. Plaintiff Cooksey does not have to provoke an actual sanction from the Board in order to assert his First Amendment rights. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (Vietnam protestor had standing to assert his First Amendment rights after refraining from leafleting under instructions from police). And the Fourth Circuit has found standing based on chilling under circumstances where the threat of official sanction was far less distinct than it is here. *See Blankenship v. Manchin*, 471 F.3d 523, 530 (4th Cir. 2006) (finding standing where plaintiff alleged his political speech was chilled by governor's statement that plaintiff's business would be subject to unspecified "tougher scrutiny"); *Constantine*, 411 F.3d at 500 (finding standing where law student alleged her criticism of faculty exam policy was chilled when she was granted only three days' notice to rewrite exam); *Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 386 (4th Cir. 2001) (finding standing based on chilling effect even though defendant agency had adopted a policy of not enforcing the challenged regulation in the Fourth Circuit).

Here, it is objectively reasonable for Plaintiff Cooksey to feel that his speech has been chilled when an official three-month investigation into his public speech and online writings—by the entity with the statutory authority to enforce the law against him—concluded that he engaged in illegal speech, that he is now compliant as a result of self-censorship, and that he will be

subject to monitoring to ensure compliance. A "person of ordinary firmness" cannot be expected to resume speaking under these circumstances.

### C. *Kemler* Is Inapposite.

The Board relies heavily on *Kemler v. Poston*, 108 F. Supp. 2d 529 (E.D. Va. 2000), but that case is easily distinguished. In *Kemler*, two Virginia judges requested an advisory opinion from the Judicial Ethics Advisory Committee on the propriety of voting in a political primary. *Id.* at 531.[2] The Committee opined that such a vote would constitute partisan political activity and hence violate judicial ethics. *Id.* at 533. The plaintiff judges then sued members of the Committee under the First Amendment on the ground that the advisory opinion chilled their participation in primary voting. *Id.* The plaintiff judges also sued members of the Judicial Inquiry Review Commission because it, not the Committee, investigates violations of the canons of judicial ethics. *Id.*

The court ruled that the plaintiff judges lacked an injury-in-fact because none of the defendants—whether members of the Committee or the Review Commission—had the authority to enforce judicial ethics. *Id.* at 538. At most, the Committee could render advisory opinions and the Review Commission could investigate public complaints and refer meritorious ones to the Virginia Supreme Court. *Id.* at 532. Furthermore, it was pure speculation that a complaint would ever find its way to the Virginia Supreme Court because: (1) the judges would have to vote in a primary; (2) someone in the general public would have to find out; (3) someone would have to complain; (4) the Review Commission would have to agree with the Committee's advisory opinion that voting is unethical; and (5) the Review Commission would have to investigate the complaint, and if it were meritorious, refer it to the Supreme Court. *Id.* at 538.

---

[2] It bears noting that the judges in *Kemler* initiated the entire controversy by seeking the advisory opinion in the first place. Plaintiff Cooksey, on the other hand, was hit with an official State Board investigation from out of the blue.

6

Plaintiff Cooksey's circumstances could not be more different. First, unlike the Committee and Review Commission in *Kemler*, the State Board has the authority to conduct disciplinary proceedings against Plaintiff Cooksey. N.C. Gen. Stat. §§ 90-365(5), -367; 21 N.C. Admin. Code § 17.0116. Second, unlike the contingencies that had to occur in *Kemler* for a complaint to be lodged, a complaint has already been lodged in this case and the public nature of Plaintiff Cooksey's online activity makes it unlikely to escape continued attention. Resp. Br. at 2. Third, whereas no entity with enforcement authority took a position in *Kemler* about primary voting, the Executive Director and various Defendants unequivocally told Plaintiff Cooksey that his speech was illegal. Compl. Ex. 1. Fourth, unlike the defendants in *Kemler*, which never investigated the plaintiff judges, the Board did investigate Plaintiff Cooksey and closed its investigation only because the Executive Director and various Defendants had been effective at silencing him. Cooksey Supp. Decl. Ex. A. Finally, unlike the defendants in *Kemler*, the Board has threatened Plaintiff Cooksey with future monitoring—and the implicit threat of sanctions—if he resumes speaking in a manner that the Board deems illegal. *Id.* Thus, *Kemler* is easily distinguishable, and Plaintiff Cooksey's self-censorship in response to the Board's actions is more than sufficient for standing.

### D.  Plaintiff Cooksey's Claims Are Ripe Because There Is a Clear Legal Dispute and He Was Not Required to Exhaust Administrative Remedies.

The Board's ripeness argument is just a rehash of its standing argument, but with a peculiar twist. Here, the Board seems to argue that Plaintiff Cooksey's claims are not ripe because he should have initiated an administrative proceeding under North Carolina law to force the Board to issue a declaratory ruling on his speech. Resp. Br. at 12.

But this is not a ripeness argument. It is an argument that Plaintiff Cooksey failed to exhaust administrative remedies. To the extent that is what the Board suggests, it is flat wrong. It

7

is well established that there is no exhaustion requirement for constitutional claims such as Plaintiff Cooksey's. *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982).

The Board's confusion is the result of its reliance on *The International Academy of Oral Medicine and Toxicology v. The North Carolina State Board of Dental Examiners*, 451 F. Supp. 2d 746 (E.D.N.C. 2006), which chose to address a justiciability problem primarily on ripeness grounds rather than standing grounds.[3] In *International Academy*, a low-level employee wrote a "Do's and Don'ts" article for the dental board's newsletter, which described advertising metal-free dentistry as a "Don't." *Id.* at 749. The dental plaintiffs sued on the ground that this "Don't" purportedly chilled their desire to advertise metal-free dentistry. *Id.* at 748. The court dismissed the suit on ripeness grounds, ruling that there was no indication that the "Don't" described in the newsletter was the official position of the dental board. *Id.* at 750. The court suggested that, given the uncertainty over the dental board's position, the plaintiff dentists could have initiated a state administrative proceeding for securing a formal declaratory ruling from the dental board on advertisements for metal-free dentistry. *Id.* at 753.

*International Academy* is easily distinguishable from this case. There, the plaintiff dentists had not yet engaged in any of the allegedly prohibited advertising; here, Plaintiff Cooksey has published extensively. There, the plaintiff dentists were not investigated for advertising; here, Plaintiff Cooksey was investigated for his speech. There, the "Do's and Don'ts" list was written by a low-level employee for a general audience; here, the red-pen review was written by Defendants and the Executive Director in direct response to Plaintiff Cooksey's speech. There, the dental board never found that the plaintiff dentists did not comply with the statute; here, the State Board found that Plaintiff Cooksey brought himself into compliance after

---

[3] As a practical matter, courts recognize that there is often little difference between standing and ripeness. *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) ("Analyzing ripeness is similar to determining whether a party has standing.").

8

the red-pen review. There, the plaintiff dentists were not subject to monitoring, and the dental board actually disavowed any interest in taking action against the plaintiffs for truthfully advertising metal-free dentistry, *id.* at 750–51; here, the State Board has said that it will monitor Plaintiff Cooksey.

Given the substantial differences between the facts of *International Academy* and the facts of this case, it is not surprising that the district court in *International Academy* found that there was no ripe controversy, or that it went on to suggest that a ripe controversy would be created if the dental board issued an adverse declaratory ruling against the plaintiffs in that case. But the conclusion that the Board draws—that a formal declaratory ruling from an administrative proceeding is *necessary* for ripeness—is wrong and has no basis in *International Academy* or the law in general.

The ripeness inquiry asks two questions: (1) is the controversy sufficiently mature that it is fit for a judicial determination; and (2) would the parties suffer hardship were the court to delay adjudication? *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).[4] This is a practical—not formalistic—inquiry that seeks to ensure that the federal courts do not imprudently exercise jurisdiction over a controversy that has not yet crystallized. But neither the courts nor aggrieved citizens are required to tolerate strategic behavior by the government in which the government takes action to secure citizen compliance in the real world but then pleads in court that the controversy is not yet ripe because there is still some yet-unexhausted bureaucratic procedure. *Cf. Sackett v. EPA*, 132 S. Ct. 1367, 1373 (2012) (concluding that

---

[4] Because the denial of speech rights is an irreparable harm, *Newsom v. Albermarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003), the Board does not appear to contest that Plaintiff Cooksey will suffer hardship if there is a delay in adjudicating ripe claims for which he has standing. Thus, the Board's ripeness argument focuses on the "fitness for judicial decision" prong.

government's characterization of a compliance order as merely "a step in the deliberative process" was insufficient to exempt action from judicial review).

For example, in *Arch Mineral Corp. v. Babbit*, the Department of Interior's Office of Surface Mining ("OSM") told Arch Mineral Corporation by letter that it was presumed responsible under the relevant statutes for remediation at a mine that it had purchased. 104 F.3d 660, 663 (4th Cir. 1997). After Arch filed suit, the OSM asserted that the claims were not ripe because perhaps the OSM would reach a different conclusion in formal administrative proceedings. *Id.* at 666. The Fourth Circuit recognized that the conclusions in the OSM's letters were consistent with the statutory presumption of ownership and "[f]or all practical purposes . . . the decision has been made." *Id.* The Fourth Circuit thus found that the controversy was ripe. *Id.* at 669.

Plaintiff Cooksey's circumstances are analogous to those of *Arch Mineral*. Plaintiff Cooksey was subject to a personal investigation by the Board, government decision-makers deemed him in violation of the law based on his personal situation, and the Board concluded that Plaintiff Cooksey had been in violation of the law, was now in compliance due to self-censorship, and that his self-censorship would be monitored. The Board's decision in this regard is perfectly consistent with the statutory framework, which prohibits speech in the form of dietary advice without a license. N.C. Gen. Stat. §§ 90-352, -365. As a practical matter, the Board made its decision, just as the OSM made its decision in *Arch Mineral*.

The Board's position on the merits—that advice about diet is categorically immune from First Amendment scrutiny and the Board may suppress even a free online advice column— further illustrates the ripeness of Plaintiff Cooksey's claims. "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on

10

future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). This case presents a pure question of law: Does the First Amendment apply at all to a layperson's advice that the government deems dangerous? Where a clear question of law is presented, the issue is fit for decision. *Va. Soc'y for Human Life, Inc*, 263 F.3d at 390; *see also S.C. Citizens for Life, Inc. v. Krawcheck*, 301 F. App'x 218, 222 (4th Cir. 2008). Accordingly, Plaintiff Cooksey's claims are ripe.

## II. PLAINTIFF COOKSEY IS LIKELY TO SUCCEED ON THE MERITS BECAUSE THE BOARD HAS NOT CARRIED ITS BURDEN UNDER THE FIRST AMENDMENT.

The Board's response to Plaintiff Cooksey's First Amendment argument illustrates precisely what is at stake in this case. Plaintiff Cooksey argues that the First Amendment limits the power of government to silence individualized speech about common topics like diet, a position consistent with decades of U.S. Supreme Court precedent. The Board responds that there are no such limits, and that a state's declaration that an entire category of individualized speech is off-limits for all but state-designated experts is wholly immune from First Amendment scrutiny.

The Board rests its entire argument for this sweeping exception to the First Amendment on a broad reading of *Accountant's Society of Virginia v. Bowman*, 860 F.2d 602 (4th Cir. 1988), a 24-year-old case based on a single concurring opinion by Justice Byron White. In making this argument, the Board apparently believes that all of the post-*Bowman* precedent that Plaintiff cites is irrelevant—so irrelevant, in fact, that the Board does not even acknowledge it, let alone attempt to distinguish it. Instead, the Board would have this Court believe that First Amendment jurisprudence stopped developing in 1988. But it did not, and the Board, accordingly, has failed to carry its burden under the First Amendment.

11

## A. The Board Willfully Ignores Supreme Court Authority in Arguing That the First Amendment Does Not Apply.

The Board argues that Plaintiff Cooksey will not succeed on the merits because under *Bowman* the First Amendment does not apply to his dietary advice.[5] The gravamen of the Board's argument is that occupational licensure—regardless of the occupation being regulated—creates a categorical exception to the First Amendment. In the Board's view, if the government perceives a conflict between something a citizen says and an occupational-licensing statute, the government may suppress that speech with impunity.

But the First Amendment does apply. Plaintiff Cooksey will not belabor the extensive arguments that he made in his opening brief nor re-cite all of the Supreme Court decisions upon which those arguments rest. Suffice it to say that *Bowman* is in serious—likely fatal—tension with intervening Supreme Court precedent. If *Bowman* has any remaining vitality, it must be interpreted narrowly to apply only to true fiduciaries. *See* Pl.'s Br. at 15–22 (explaining why Justice White's concurrence in *Lowe v. SEC*, 472 U.S. 181 (1985), and its progeny, including *Bowman*, do not resolve this case).

Relying on *Bowman*, the Board insists—even though Plaintiff Cooksey does nothing but speak—that its regulation of Plaintiff Cooksey is somehow only "incidental" to its regulation of something else, although this something else is never actually identified. Defs.' Br. at 16.[6] This

---

[5] The Board attempts to portray North Carolina's law as narrow and inoffensive because it does not prohibit Plaintiff from "discussing his views on the healthiest foods to eat," so long as he does not recommend that any individual person eat anything in particular. Defs.' Br. at 1–2. The Supreme Court has long recognized, however, that "'[f]ree trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *Thomas v. Collins*, 323 U.S. 516, 537 (1945). This right is squarely implicated by the Board's sweeping restrictions on dietary advice.

[6] It bears repeating that, as applied to Plaintiff Cooksey, North Carolina's dietitian-licensing law applies exclusively to speech. The Board has not identified any form of non-speech conduct that Plaintiff Cooksey engages in that would bring him within the scope of the law.

12

argument is impossible to square with the Supreme Court's jurisprudence. As the Court made clear in *Sorrell v. IMS Health, Inc.*, a burden on speech cannot be considered "incidental" when it "is directed at certain content and is aimed at particular speakers." 131 S. Ct. 2653, 2665 (2011). That is precisely the case here, where the prohibition is aimed solely at speech about diet and nutrition by speakers who are not licensed dietitians.[7] Simply put, "as applied to [Plaintiff Cooksey] the conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2724 (2010). The burden on speech in this case, therefore, is direct, not incidental.

Even if the burden on speech in this case could be considered incidental, that would still not suffice to eliminate First Amendment review. It is well established that laws that impose merely incidental burdens on speech are still subject to First Amendment scrutiny. *See United States v. O'Brien*, 391 U.S. 367, 377 (1968).[8] This intermediate standard of review requires genuine evidence; the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion) (internal citation

---

[7] As one commentator has explained:

> When the government restricts professionals from speaking to their clients, it's restricting speech, not conduct. And it's restricting the speech precisely because of the message that the speech communicates, or because of the harms that may flow from this message. The restriction is not a "legitimate regulation of professional practice with only incidental impact on speech"; the impact on the speech is the purpose of the restriction, not just an incidental matter.

Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 Cornell L. Rev. 1277, 1346 (2005).

[8] Plaintiff Cooksey emphasizes that the intermediate standard of review set forth in *O'Brien* is reserved for content-neutral laws, which North Carolina's is not for the reasons set forth in Pls.' Br. 8-11 and at p.18, below. Content-based laws, like North Carolina's, are presumptively subject to a higher standard of review than is provided for by *O'Brien*.

13

omitted). Any interpretation of *Bowman* that relieves the government of this evidentiary burden—as the Board's interpretation would—must be rejected as inconsistent with Supreme Court precedent. Because this is a First Amendment case, the burden of proof rests with the Board at the preliminary-injunction stage. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Thus, if the First Amendment applies at all—whether requiring intermediate or strict scrutiny—Plaintiff Cooksey's unrebutted arguments establish a likelihood of success on the merits.

### B. The Remaining Cases the Board Cites Are Either Bad Law or Distinguishable.

Plaintiff Cooksey's Motion for Preliminary Injunction should be decided on the Supreme Court authority that he cites in his opening brief—the same authority that the Board willfully ignores. But even if the Court were to look at the few decisions that the Board cites (but does not explain), they are inapposite. In *Ohralik v. Ohio State Bar Association*, 436 U.S. 447 (1978), for example, the Supreme Court reviewed a restriction on commercial speech—specifically in-person solicitation of clients by lawyers. In that case the Supreme Court held that regulating in-person solicitation of clients by lawyers was constitutional because the disparity between an attorney and potential client is so stark that potential clients must be protected from attempts to pressure them into snap decisions. *Id.* at 457–58, 467. In a different factual context, however, involving solicitations by CPAs, the Court reached precisely the opposite conclusion, emphasizing that the mere fact that restrictions on speech may be constitutional in some contexts does not establish a universal rule exempting all such speech from the protection of the First Amendment. *Edenfield v. Fane*, 507 U.S. 761, 765–66 (1993) ("There are, no doubt, detrimental aspects to personal commercial solicitation in certain circumstances, but these detriments are not so inherent or ubiquitous that solicitation of this sort is removed from the ambit of First

14

Amendment protection." (internal citation omitted)). Taken together, these cases emphasize the importance of case-by-case analysis when speech is restricted, even in a commercial context, and reject the sort of blanket exemption from First Amendment review that the Board advocates.

Similarly, in *National Association for the Advancement of Psychoanalysis v. California Board of Psychology* (*NAAP*), the Ninth Circuit held that, in the context of psychological counseling between a practitioner and patient, the speech that occurs in therapy is analogous to medicine administered by a physician, and further that the state has a compelling interest in regulating the administration of treatment in a practice setting. 228 F.3d 1043, 1054–56, n.8 (9th Cir. 2000).[9] Unlike North Carolina's dietetics law, California's law did not apply to uncompensated speech like Plaintiff Cooksey's advice to friends and family or his online column. *Id.* at 1055 & n.8. Further, *NAAP* did not take the categorical approach taken by the Board in this case, but rather held that the psychoanalytical speech at issue was entitled to First Amendment protection, but that the state carried its burden. *Id.* at 1054 (noting that "[t]he communication that occurs during psychoanalysis is entitled to constitutional protection").

*Underhill Associates v. Bradshaw*, 674 F.2d 293 (4th Cir. 1982)—which is even older than *Bowman* and thus even further distanced from the Supreme Court's modern First Amendment jurisprudence—is also not compelling precedent for the Board's position. That case, which involved a registration requirement for securities brokers, was challenged only as a restriction of commercial speech. The court correctly recognized that the registration requirement did not impose a burden on commercial speech—i.e., advertising. *Id.* at 296. Moreover, the registration requirement in that case was minimal, requiring only that securities brokers file an

---

[9] Tellingly, *NAAP* was a post-*Lowe* case, but did not mention the *Lowe* concurrence, much less adopt it, likely because the *Lowe* concurrence was not good First Amendment law then and, for the reasons explained in Plaintiff's opening brief, is not good First Amendment law now.

application and pay a fee. *Id.* at 294. It was a far cry from the extensive educational requirements that North Carolina imposes on speakers like Plaintiff Cooksey. *See* N.C. Gen. Stat. § 90-357.

Finally, although *Locke v. Shore* is the most recent case upon which the Board relies, its analysis rests almost entirely on *Bowman*. 634 F.3d 1185, 1191 (11th Cir. 2011). But as Plaintiff Cooksey explained in his opening brief and has reiterated here, the reasoning of *Bowman* cannot be reconciled with the Supreme Court's modern First Amendment jurisprudence. Much like the Board's response brief, *Locke* does not acknowledge or attempt to distinguish this precedent. Accordingly, *Locke* does not provide persuasive support for the Board's position.

Simply put, Plaintiff Cooksey's speech involves no sensitive relationship (as in psychological counseling), no uniquely vulnerable listeners (as in potential legal clients forced to make snap decisions), and no plausible presumption that the listeners are unable to exercise independent judgment. A person who writes in to a free, online advice column is not the equivalent of the *Ohralik* accident victim approached in person by a lawyer seeking to establish a client relationship. Nor, as the declaration of Karen Gale demonstrates, is a person who receives advice online or over the phone about what food to buy at the grocery store the equivalent of a mental-health patient being administered treatment in a practitioner's office. Decl. of Karen Gale in Supp. of Pl.'s Mot. Prelim. Inj. ¶¶ 5–19. The Board's argument that Plaintiff Cooksey's listeners have to be protected because they cannot possibly resist his advice later on when they are alone at the grocery store is an absurdity given that North Carolina law allows a food salesman to follow anyone around the grocery store and personally advise her to buy the salesman's products to improve her health. *See* N.C. Gen. Stat. § 90-368(6).

### C. The Board Fails to Address, Much Less Rebut, the Following First Amendment Arguments Establishing a Likelihood of Success on the Merits.

If, as it should, this Court finds that the First Amendment does apply, then Plaintiff Cooksey notes that the Board failed to address, much less rebut, the following four arguments indicating a likelihood of Plaintiff Cooksey's success on the merits: (1) the context of Plaintiff Cooksey's speech; (2) the law's underinclusiveness; (3) the law's content-based nature; and (4) the absence of any historical basis for regulating dietary speech.

**Context:** The Board does not contest that North Carolina's licensing law applies indiscriminately to all of Plaintiff Cooksey's individualized speech about diet, whether shared for free to friends and family or through his free online advice column, or whether shared for pay to his life-coaching clients. In other words, it truly is the State Board's position that countless advice columns and Internet forums across the country in which people give each other individualized advice about diet—not to mention columns such as Dear Abby on other topics— are wholly outside the First Amendment. That cannot be, and is not, the case.

**Underinclusiveness:** The Board also does not contest that many unlicensed individuals are statutorily permitted to give dietary advice that is materially indistinguishable from Plaintiff Cooksey's. *See* Pl.'s Br. at 14–15 (discussing the fatal underinclusiveness of North Carolina's dietitian-licensing law). If advice about what to buy at the grocery store were genuinely as hazardous as bad medical or legal advice, grocery-store employees and sellers of dietary supplements with no dietetics training would not be exempt from North Carolina's law. *See* N.C. Gen. Stat. § 90-368(6), (9). Unsurprisingly, North Carolina's occupational-licensing laws for doctors and lawyers contain no similarly broad exemptions for wholly untrained persons.[10] Such

---

[10] *See* N.C. Gen. Stat. § 90-18(c) (listing exceptions to "the practice of medicine," none of which apply to untrained persons in a commercial setting); N.C. Gen. Stat. § 84-4 (prohibiting non-attorneys from performing any legal services, with the sole exception of drafting a will in an

17

underinclusiveness is fatal under First Amendment scrutiny. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (holding underinclusiveness fatal under strict scrutiny); *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 193–94 (1999) ("Even under the [intermediate] degree of scrutiny that we have applied in commercial speech cases, decisions that select among speakers conveying virtually identical messages are in serious tension with the principles undergirding the First Amendment.").

**Content-Based:** The Board also implicitly concedes that North Carolina's law is content-based. It puts forward no argument that the law is content-neutral, and no such argument could be justified. The Board admits that it is concerned about what people will do with the information they receive from Plaintiff Cooksey, but "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). Thus, as a content-based restriction on speech, North Carolina's law would ordinarily be subject to "exacting scrutiny." *United States v. Alvarez*, No. 11-210, 2012 U.S. LEXIS 4879, at *11 (U.S. June 28, 2012) (plurality opinion).

**No Historical Basis for Regulation:** Finally, the Board also implicitly concedes that it has no evidence that speech about diet and nutrition has been considered historically unprotected by the First Amendment. As the Supreme Court recently reiterated, "Before exempting a category of speech from the normal prohibition on content-based restrictions . . . the Court must be presented with 'persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription.'" *Alvarez*, No. 11-210, 2012 U.S. LEXIS 4879, at *22 (*quoting Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2734 (2011)). The Board has produced no such evidence, which is unsurprising given that no state restricted

emergency situation "wherein the imminence of death leaves insufficient time to have the same drawn and its execution supervised by a licensed attorney-at-law").

dietary speech until Texas enacted the first such law in 1983, and North Carolina did not enact its restrictions on dietary speech until 1991. *See* 1991 N.C. Adv. Legis. Serv. 668 (LexisNexis).

### III. THE REMAINING PRELIMINARY-INJUNCTION FACTORS FAVOR PLAINTIFF COOKSEY.

In large part because Plaintiff Cooksey has demonstrated a likelihood of success on the merits, the remaining preliminary-injunction factors all favor Plaintiff Cooksey. The Board has conceded that chilling speech is an irreparable harm and argues only that no harm occurred because no chilling occurred. Resp. Br. at 16. Because the Board is wrong, Plaintiff Cooksey has demonstrated irreparable harm.

The balance of equities and public interest also favor Plaintiff Cooksey. The Board's long argument about the balance of equities and public interest is premised on an error. The Board asserts that "Plaintiff Cooksey's request for preliminary injunctive relief would have the Board enjoined from enforcing the Act in any context." Resp. Br. at 19.

That is simply not true. Plaintiff Cooksey respectfully requests a preliminary injunction consistent with his likelihood of success on the merits. That means that the Court would preliminarily enjoin the Board from enforcing the dietetics-licensing law against Plaintiff Cooksey and other laypeople like him who want to offer advice, either for free or for compensation, about what food to buy at the grocery store. The Court has broad discretion in crafting a preliminary injunction, *Westmoreland Coal Co., Inc. v. Int'l Union, United Mine Workers of Am.*, 910 F.2d 130, 135 (4th Cir. 1990), and can exercise that discretion here to restrict the injunction to speech that occurs outside the clinical- or institutional-practice settings. This sort of speech has historically been unregulated, and it is legally available in North Carolina in self-help books and from food retailers. In other words, where the advice is simply about what food to buy at the grocery store and that advice is provided in a context in which no reasonable

person would feel deprived of her independent judgment—such as a free, online advice column, free advice among friends or strangers, or as part of a life-coaching relationship—that speech is protected. As Plaintiff Cooksey made clear in his opening brief, neither the Board nor the public has any legitimate interest in the unconstitutional suppression of protected speech. Pl.'s Br. at 22–24. Thus, the balance of equities and public interest favor Plaintiff Cooksey.

## CONCLUSION

Under the facts of this case, the content-based censorship of Plaintiff Cooksey's advice to willing listeners is anathema to the First Amendment. A preliminary injunction should issue because Plaintiff Cooksey has standing, his claims are ripe, and he has satisfied the four elements necessary for preliminary-injunctive relief.

Dated this 13th day of July, 2012.

Respectfully submitted,

/s/_____
Jeff Rowes*
Paul M. Sherman*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Telephone: (703) 682-9320
Fax: (703) 682-9321
E-mail: jrowes@ij.org; psherman@ij.org
*Admitted Pro Hac Vice*

*Attorneys for Plaintiff*

Robert W. Shaw (N.C. State Bar No. 32923)
WILLIAMS MULLEN
P.O. Box 1000
Raleigh, NC 27602
Telephone: (919) 981-4310
Fax: (919) 981-4300
E-mail: rshaw@williamsmullen.com

*Local Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 13th day of July, 2012, a true and correct copy of the

foregoing **PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR**

**PRELIMINARY INJUNCTION** was electronically filed with the Clerk of the Court using the

CM/ECF system, which will serve notification of such filing on the following Defendants:


Michelle Futrell
Chair of the North Carolina Board of Dietetics/Nutrition
1000 Centre Green Way, Suite 200
Cary, NC 27513
(919) 228-6391

Brenda Burgin Ross
Vice Chair of the North Carolina Board of Dietetics/Nutrition
1000 Centre Green Way, Suite 200
Cary, NC 27513
(919) 228-6391

Richard W. Holden, Sr.
Treasurer of the North Carolina Board of Dietetics/Nutrition
1000 Centre Green Way, Suite 200
Cary, NC 27513
(919) 228-6391

Kathleen Sodoma
Secretary of the North Carolina Board of Dietetics/Nutrition
1000 Centre Green Way, Suite 200
Cary, NC 27513
(919) 228-6391

Christie Nicholson
Member of North Carolina Board of Dietetics/Nutrition
1000 Centre Green Way, Suite 200
Cary, NC 27513
(919) 228-6391

Phyllis Hilliard
Member of North Carolina Board of Dietetics/Nutrition
1000 Centre Green Way, Suite 200

Cary, NC 27513
(919) 228-6391

Cathleen E. Ostrowski
Member of North Carolina Board of Dietetics/Nutrition
1000 Centre Green Way, Suite 200
Cary, NC 27513
(919) 228-6391


/s/ _____
Jeff Rowes*
Paul M. Sherman*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Telephone: (703) 682-9320
Fax: (703) 682-9321
E-mail: jrowes@ij.org; psherman@ij.org
*Admitted Pro Hac Vice

Attorneys for Plaintiff

Robert W. Shaw (N.C. State Bar No. 32923)
WILLIAMS MULLEN
P.O. Box 1000
Raleigh, NC 27602
Telephone: (919) 981-4310
Fax: (919) 981-4300
E-mail: rshaw@williamsmullen.com

Local Counsel for Plaintiff