**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case Number: 3:12-cv-00336-MOC-DSC**

| | |
|---|---|
| STEVE COOKSEY,<br><br>    Plaintiff,<br><br>  v.<br><br>MICHELLE FUTRELL, *et al.*,<br><br>    Defendants. | **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |

Defendants, who have been sued in their official capacities as members of the North Carolina Board of Dietetics/Nutrition (the "Board"), respectfully submit this memorandum of law in support of their motion to dismiss plaintiff's complaint and state as follows:

## INTRODUCTION

Plaintiff Steve Cooksey is an internet blogger and an outspoken advocate for the "Paleolithic" diet as a means of losing weight and controlling diabetes. In the wake of a complaint to the Board that plaintiff was practicing dietetics without a license, the Executive Director of the Board provided informal guidance to plaintiff in the form of hand-written comments on pages from his website (the "Comments"). The Comments suggested that assessing specific individuals' circumstances and offering them dietetic advice based on those circumstances constitutes a professional service requiring a license under the Dietetics/Nutrition Practice Act, N.C. Gen. Stat. § 90-350, *et seq.* (the "Act"). Plaintiff now asks this Court to declare the Act and related regulations, 21 N.C.A.C. § 17.010, *et seq.* (the "Regulations"), to be unconstitutional restrictions of free expression protected under the *First Amendment* to the United States Constitution.

Plaintiff describes his case as a challenge to "content-based censorship" of protected speech. (Compl., "Introduction")  However, plaintiff's own allegations reveal that the Board has not "censored" him.  The Board has taken no formal administrative action of any nature with respect to plaintiff, leaving the Court to speculate as to what action the Board might have taken had plaintiff pursued the administrative procedures and remedies available under North Carolina law.  Further, nothing in the Act, the Regulations or the Comments attempts to limit or dictate the content of expressions concerning matters of diet and nutrition.  Plaintiff remains free to endorse and discuss a Paleolithic diet (or Mediterranean diet, "South Beach" diet or even a jellybean and popcorn diet if he so chooses).  While plaintiff's unlicensed status prevents him from assessing and counseling specific individuals, it does not prevent him from expressing his views on the Paleolithic diet, conventional diabetes treatment or other dietetic/nutritional issues.

This action therefore does not challenge "content-based censorship."  Instead, it challenges the principle long-recognized and still valid in the Fourth Circuit that professional regulations are not invalid, or even subject to *First Amendment* scrutiny, merely because they govern conduct that includes communications.  *Accountant's Soc. of Virginia v. Bowman*, 860 F.2d 602, 604-05 (4th Cir. 1988); *see also Greater Balt. Ctr. for Pregnancy Concerns v. Mayor & City Council*, Nos. 11-1111, 11-1885, 2012 U.S. App. LEXIS 13157, at *26 n.3 (4th Cir. June 27, 2012) (unpublished decisions are attached collectively as Ex. 1.)  So long as a statute merely restricts communications where there is a "personal nexus" involving the exercise of judgment in light of the individual needs and circumstances of the person receiving the advice, it is a permissible regulation of a profession that does not violate the *First Amendment*.  *Id.*  The Act, the Regulations and the Comments adhere closely to this standard.

Plaintiff and his lawyers obviously disagree with the principle set out in *Bowman* and would apparently have this Court subject any professional licensing regulation with an incidental

effect on communications to strict *First Amendment* scrutiny. Indeed, in plaintiff's demand for relief, he specifically asks this Court to declare unconstitutional that which is constitutional under *Bowman* – the requirement of a license to provide advice as to "what a *specific individual ought to eat in light of the circumstances of that individual's life.*" (Compl., "Prayer for Relief") (emphasis added) However, the principle set out in *Bowman*, and reaffirmed last month in *Greater Baltimore Center*, remains the law in this Circuit and bars plaintiff's alleged claims in this Court.

For these reasons, the Court should grant the Board's motion to dismiss plaintiff's complaint for lack of subject matter jurisdiction and for failure to state a claim on which relief may be granted pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

### The Act

The North Carolina General Assembly adopted the Act in 1991 for the express purpose of protecting "the public health, safety and welfare and to protect the public from being harmed by unqualified persons by providing for the licensure and regulation of persons engaged in the practice of dietetics/nutrition and by the establishment of educational standards for those persons." N.C. Gen. Stat. § 90-351. The Act comprises Article 25 of Chapter 90 of the North Carolina General Statutes, which regulates "Medicine and Allied Occupations." Included within the scope of Chapter 90 is a wide range of medical professionals and related occupations, such as physicians and physician assistants (Article 1), dentists (Article 2), pharmacists (Article 4), optometrists (Article 6), chiropractors (Article 8) and nurses (Article 9).

Under the Act, a license is required to provide "nutrition care services," which is defined to include "[a]ssessing the nutritional needs of individuals and groups" and "[p]roviding nutrition counseling in health and disease." N.C. Gen. Stat. §§ 90-352, 365. The Act also establishes the

3

minimum qualifications to be eligible for licensure (§ 90-357) and requires the Board – among other duties – to "[d]etermine the qualifications and fitness of applicants for licenses," enact rules necessary to carry out its duties, adopt a Code of Ethics, conduct investigations and "do all other things necessary and proper" to enforce the Act (§ 90-356). Pursuant to its rule-making authority and obligations, the Board promulgated the Regulations, which address Licensure (21 N.C.A.C. § 17.0100, *et seq.*), Review and Approval of Weight Control Services (§ 17.0200, *et seq.*), Dietetic/Nutrition Students or Trainees (§ 17.0300, *et seq.*) and Unlicensed Individuals (§ 17.0400, *et seq.*).

### *Plaintiff's Allegations*

In late 2008, plaintiff was obese, sedentary and chronically ill. (Compl., ¶ 7) In February of 2009, he was admitted to intensive care on the verge of a diabetic coma and diagnosed with Type II diabetes. (*Id.*, ¶¶ 9-10) After his diagnosis, plaintiff researched a variety of sources for information concerning dietary choices for diabetics. (*Id.*, ¶ 16) Based on his research, plaintiff became convinced that the healthiest diet for him would be a high-fat/low-carbohydrate diet akin to that of Stone Age people – the so-called Paleolithic diet. (*Id.*, ¶¶ 16-17, 20-21) He adopted Paleolithic diet principles, began exercising and enjoyed positive results. (*Id.*, ¶¶ 22-25)

About a year later, plaintiff started a website – later named "Diabetes Warrior" – to share information about his success with the Paleolithic diet. (*Id.*, ¶ 26) Over time, plaintiff's website expanded beyond merely sharing plaintiff's own experiences with and opinions about Paleolithic diet principles to include plaintiff's direct advice to specific readers with dietary questions. (*Id.*, ¶¶ 32-33, 37) In autumn 2010, plaintiff saw an opportunity to turn his dietary advice into a revenue stream and began offering diabetes "Support Packages," which included direct telephone and email counseling for a fee. (*Id.*, ¶¶ 58-59, Ex. 1 at 13-16) He represented that he could help clients who purchased one of these packages "(1) Improve Blood Sugar Control[,] (2) Lose

Weight [and] (3) Improve [their] health and fitness." (*Id.*) By the end of 2011, plaintiff had also incorporated an advice column into his website for the express purpose of providing dietary and nutritional advice in response to specific questions from readers. (*Id.*, ¶¶ 39-50)

In January 2012, plaintiff attended a nutritional seminar for diabetics. (*Id.*, ¶ 60) During the question and answer portion of the seminar, plaintiff expressed his views about the "standard high-carbohydrate/low-fat diet for diabetics." (*Id.*, ¶¶ 61-62) The full scope and content of plaintiff's comments is not entirely clear from the complaint, but someone in attendance at the seminar contacted the Board's offices and complained that plaintiff was acting as an unlicensed dietitian. (*Id.*, ¶ 63) The Board's Executive Director Charla Burill contacted plaintiff to inform him of the complaint. (*Id.*) In accordance with the requirements of the Act and the Regulations, the complaint prompted Ms. Burill to work with the Board's Complaint Committee to investigate plaintiff's activities. (*Id.*, ¶¶ 63, 67) Ms. Burill subsequently sent plaintiff an email with a guideline summarizing the Act and an email with the Comments, which consisted of hand-written comments and suggestions on printed pages from plaintiff's website. (*Id.*, ¶¶ 70-72, Ex. 1)

Significantly, neither the formal guideline nor the informal Comments suggested any limitation on plaintiff's expression based on the content of his opinions. In accordance with the Act and the Regulations – and as plaintiff himself acknowledges – the "general thrust" of the Comments was that he could express his opinions about dietary matters but could not perform individualized personal assessments and counseling. (*Id.*, ¶¶ 73-83, Ex. 3) The Board did not take, or even threaten, any formal or official action in response to the complaint lodged against plaintiff, and plaintiff expressed no objections to the Comments or guideline he received before filing this lawsuit.

## **ARGUMENT**

Based on the facts alleged in the complaint and contained in the materials referenced in the complaint, plaintiff's claims should be dismissed for lack of subject matter jurisdiction and failure to state a claim on which relief may be granted.

## I.     THE COURT DOES NOT HAVE JURISDICTION OVER THIS CASE.

Under Article III of the United States Constitution, federal courts only have jurisdiction over "cases and controversies." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). To satisfy this case-or-controversy requirement, a plaintiff must have standing and his claims must be ripe. *Id.* at 316, 318-19. Plaintiff's *First Amendment* claims hinge on (1) Ms. Burill's Comments – which note "areas of concern," invite further discussion and "ask" him to make changes to his website if he agreed with the Comments – and (2) an investigation into plaintiff's website – which was triggered by a third-party complaint against him for the unlicensed practice of dietetics/nutrition. (Compl., ¶¶ 63-65, 67-89, 98, 101-05, Ex. 4) Plaintiff never mentioned any disagreement with the "areas of concern," nor did he seek or receive a decision from the Board regarding the Act's application to his activities. By bringing an abstract claim based on how the Board *might* have interpreted and enforced the Act, plaintiff has failed to satisfy Article III's ripeness and standing requirements.

### A.     Plaintiff's Claims Are Not Ripe.

For this case to be ripe for judicial review, it must involve "an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties." *See Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992) (citing *Pacific Gas & Elec. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 200 (1983)). This requirement "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference" before there is a formal decision with concrete

6

effects. *The Int'l Acad. of Oral Med. & Toxicology v. The North Carolina State Bd. of Dental Exam'rs*, 451 F. Supp. 2d 746, 749 (E.D.N.C. 2006) ("*International Academy*") (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003)).

Like plaintiff, the *International Academy* plaintiff brought claims prior to a formalized administrative decision. There, a non-profit dental academy brought *First Amendment* claims against the North Carolina Dental Board because of a Dental Board article advising dentists not to advertise, *inter alia*, that they practice mercury-free dentistry or that patients should eliminate exposure to mercury. *Id.* at 748. Though the article noted that failure to comply with the advertising rules would result in disciplinary action, the *International Academy* court dismissed the dentists' claims as unripe after analyzing the two factors a court "must evaluate" when assessing ripeness: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* at 749 (quoting *Nat'l Park Hospitality*, 538 U.S. at 807-08)).

### 1. *Fitness of the Issues for Judicial Decision*

A case is fit for judicial decision only where "the issues to be considered are purely legal ones and where the agency rule or action giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency rulings." *Id.* at 750 (quoting *Charter Fed.,* 976 F.2d at 208). Finding the case to be unfit for judicial decision, the *International Academy* court concluded that the article was "(at most) a Dental Board employee's informal interpretation of the governing regulations on advertising" rather than the Dental Board's final, official policy. *Id.* at 750-51. The court reasoned that postponing consideration of the plaintiffs' claims would give the Dental Board a chance to interpret its own statutes and regulations, the outcome of which could "materially alter the question to be decided." *Id.* at 751-52 (quoting *Renne v. Geary*, 501 U.S. 312, 323 (1991)).

Here, a board employee "reviewed [plaintiff's] website with the Complaint Committee," gave plaintiff informal comments regarding "areas of concern," and "ask[ed]" him to make changes only if he agreed with the comments. (Compl., ¶¶ 71-89, Ex. 4) While the Board has adopted a formal guidance document summarizing the Act for unlicensed persons (Compl., Ex. 3), the Board was given no opportunity to make any decision concerning plaintiff's activities. Under *International Academy* this matter is not yet fit for judicial decision.[1]

### 2. *Hardship to the Parties*

The hardship to the parties "is measured by the immediacy of the threat and the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law." *Int'l Acad.*, 451 F. Supp. 2d at 753 (quoting *Charter Fed.*, 976 F.2d at 208-09). While the Dental Board article in *International Academy* indicated how the Dental Board might interpret its regulations, those regulations also provided that dentists could seek a declaratory opinion from the Dental Board on whether conduct complied with its statutes or regulations. *Id.* at 753. Acknowledging the existence of "arguable free-speech concerns," the court noted that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). The *International Academy* court ultimately determined that there was no substantial hardship and that an official interpretation would clarify the Dental Board's position and "formulate a controversy specific enough for a court to adjudicate." *Id.* at 754.

Plaintiff likewise could have sought Board determination as to whether his actions violated the Act. *See* N.C. Gen. Stat. § 150B-4 (providing that, upon request of an aggrieved

---

[1] The Board was required to investigate plaintiff following the third-party complaint lodged against him for the unlicensed practice of dietetics. *See* 21 N.C.A.C. 17.0116(d) ("An Investigator or other authorized Board staff *shall* investigate a complaint . . . .") (emphasis added). In *International Academy*, the court determined that the Dental Board's investigation of two dentists "d[id] not alter the unclear nature of the Dental Board's policy on a dentist's speech" where the Dental Board neither voted to take action nor determined whether violations occurred. 451 F. Supp. 2d at 752. Similarly, the Board's investigation in this case is no substitute for a final Board decision.

8

party, "an agency shall issue a declaratory ruling as to the validity of a rule or as to the applicability to a given state of facts of a statute administered by the agency or of a rule or order of the agency"). Similarly, the Board is obligated to "[c]onduct administrative hearings in accordance with Article 3A of Chapter 150B of the General Statutes when a 'contested case' . . . arises under this Article." N.C. Gen. Stat. § 90-356 (8).[2] Consequently, there is little hardship in requiring plaintiff to seek a formal Board interpretation of the Act before asking the Court to declare a statute and related regulations unconstitutional.

"Strict application of the ripeness doctrine prevents federal courts from rendering impermissible advisory opinions and wasting resources through review of potential or abstract disputes." *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005). The Court should exercise particular caution not to decide potential or abstract disputes where – as in this case – the effect of granting the requested relief would be to strike down a statute that has been duly enacted by the elected legislature of a sovereign state. The Court should therefore dismiss the complaint because plaintiff's claims are not yet ripe.

### B. Plaintiff Does Not Have Standing To Bring These Claims.

Plaintiff's allegations of possible future injury are also insufficient to satisfy Article III's standing requirements. To have standing, a plaintiff must – "[a]t an irreducible minimum" – show "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Trinity Baptist Church, Inc. v. City of Asheville*, 88 F. Supp. 2d 487, 490 (W.D.N.C. 1999). This injury must be "an invasion of a legally protected interest" that is (1) "concrete and particularized" and (2) "actual or imminent" rather than

---

[2] Plaintiff failed to exhaust these administrative remedies available to him under North Carolina law. This Court has previously held, "It is well settled that plaintiffs must exhaust their administrative remedies under state law before suing in federal court." *Campbell v. Attaway*, No. 3:09CV294-RJC-DSC, 2009 U.S. Dist. LEXIS 104391, at *4 (W.D.N.C. Nov. 4, 2009), *adopted*, 2010 U.S. Dist. LEXIS 897 (W.D.N.C. Jan. 6, 2010); *see also Justice for Animals, Inc. v. Robeson County*, 164 N.C. App. 366, 369 (N.C. Ct. App. 2004) ("If a plaintiff has failed to exhaust its administrative remedies, the court lacks subject matter jurisdiction and the action must be dismissed.").

9

"conjectural or hypothetical." *Kemler v. Poston*, 108 F. Supp. 2d 529, 534 (E.D. Va. 2000) (quotation marks omitted).

While standing requirements are more relaxed for *First Amendment* cases, this "in no way erode[s] the established principle that" a plaintiff "must show that he has sustained, or is immediately in danger of sustaining, a direct injury as a result of the action." *Id.* at 536 (quotation marks omitted). In *Kemler*, the court held that two substitute judges lacked standing to bring a *First Amendment* challenge to a Judicial Ethics Advisory Committee advisory opinion, which took the view that, "to avoid the appearance of impropriety, Virginia judges must refrain from voting in primary elections." *Id.* at 531. In reaching its conclusion, the *Kemler* court found that the plaintiffs were unable to show (1) that they had been "compel[led] to do, or to refrain from doing, anything" and (2) that there was no threat of "imminent enforcement" of the advisory opinion. *Id.* at 538.

In the present case, the Board never compelled plaintiff to refrain from doing anything, and there was neither actual nor imminent enforcement of the Act. Indeed, while plaintiff claims to be faced with "speech-chilling uncertainty about the legality of [communications] in the form of personal dietary advice" (Compl., ¶¶ 103-104), his recent conduct suggests that his speech has hardly been "chilled." As recently as last week, he was providing detailed, individualized advice to diabetics. (Ex. 2, July 20, 2012 excerpt from plaintiff's website) (providing reader with a meal plan and advising her to "[e]at 30 grams of TOTAL carbs per day (do not count net carbs) . . . or less until your blood sugars stabilize in the sub 100 mg/dl range while in a fasted state" and to "reduce drugs and insulin" when her "blood sugars drop in the 80-90's fasted")[3]

---

[3] Plaintiff has made his website part of the pleadings by referring to it in his complaint and incorporating numerous references and excerpts into his pleading. (*See, e.g.*, Compl., ¶¶ 5, 40, 42-49, 75-76, 88, Ex. 1) In any case, the Court may consider evidence outside the pleadings in deciding a question of standing. *See Trinity Outdoor, L.L.C. v. City of Rockville*, 123 Fed. Appx. 101, 105 (4th Cir. 2005) ("in assessing a question of standing, a district court may consider evidence outside the pleadings without converting the proceeding to one for summary judgment") (quotation marks omitted).

In the absence of a threat of imminent enforcement, plaintiff's claims merely present legal questions "in the rarefied atmosphere of a debating society" rather than the "concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 153-54 (4th Cir. 2000) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982)).  Accordingly, plaintiff lacks standing to assert the claims alleged in his complaint, and the Court should grant the Board's motion to dismiss.

## II. THE ACT IS A VALID REGULATION ON PROFESSIONAL SERVICES THAT DOES NOT VIOLATE PLAINTIFF'S FREE SPEECH RIGHTS.

Contrary to plaintiff's dramatic characterization of his claims as a challenge to unconstitutional "censorship," this case is not actually about an infringement of plaintiff's rights under the *First Amendment*.  On closer examination, it is about North Carolina's authority to license occupations to safeguard the public health and safety.  Stated simply, the challenged Act – which requires individuals to be licensed before practicing dietetics/nutrition – is a professional regulation that does not abridge the freedom of speech protected under the *First Amendment*.

### A. The Regulation Of Dietitians and Nutritionists Promotes A Compelling Governmental Interest.

As a threshold matter, it is well established that states may regulate the practice of professions:

> States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions.

*Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 108 (1992).  This is particularly true with respect to the regulation and licensing of professions that directly implicate matters of public health, like those appearing in Chapter 90.  *National Ass'n for the Advancement of*

Case 3:12-cv-00336-MOC-DSC   Document 20   Filed 07/27/12   Page 11 of 22

*Psychoanalysis v. California Bd. of Psychology*, 228 F.3d 1043, 1054 (9th Cal. 2000) (*"NAAP"*) (noting that exercising "the state's police power to regulate and license professions" is especially proper "when public health concerns are affected") (citing *Watson v. Maryland*, 218 U.S. 173, 176 (1910).

Despite the obvious correlation between dietary counseling and health, plaintiff attempts to minimize the value of the Act and the Regulations by noting: (1) a lack of evidence that his unlicensed advice has caused harm yet; and (2) that a person may choose not to follow a dietitian's advice (which, of course, could also be said about the advice of most other licensed professionals, including physicians, attorneys and accountants).  (Compl., ¶¶ 97, 120)  Contrary to plaintiff's facile dismissal of the Act's importance, however, the circumstances presented in this case highlight the very reasons that such regulation and licensing requirements advance the state's compelling interest in protecting the health and welfare of its citizens.

Plaintiff downplays the nature and scope of his activities, describing them as giving "ordinary advice on [the] age-old topic" of healthy eating to his "genuine friends."  (Compl., "Introduction," ¶¶ 32-33, 54-55)  In reality, as plaintiff concedes elsewhere in his complaint, his website had approximately 20,000 unique visitors over just a 2-month period, and it was viewed in over 100 countries spanning 6 continents in December of last year.  (*Id.* ¶¶ 26, 38)  Plaintiff provided advice to people across the United States and its territories plus Canada, Great Britain, Jamaica, Indonesia, Australia and South Africa.  (*Id.* ¶ 38)  His target audience is a uniquely vulnerable population that suffers from the chronic and life-threatening condition of diabetes and often struggles to control blood sugar levels.  Despite the potentially serious health implications of plaintiff's advice, as a non-licensee he is not subject to the numerous limitations and obligations designed to protect persons receiving such individualized dietary counseling.  By way of example:

- **Satisfying minimum qualification levels and requirements for continuing education** (N.C. Gen. Stat. §§ 90-356, 357, 365; 21 N.C.A.C. §§ 17.0103-.0106) – Plaintiff does not allege that he has any specialized training or education on managing and treating diabetes. There are more variables to consider in the assessment of a diabetic's diet than protein, carbohydrates and exercise. (D.E. # 14 at 19-20) However, without adequate and appropriate training, plaintiff may not have a foundation for appreciating the significance of factors he does not consider in rendering advice.

- **Coordinating care with other health care providers** (21 N.C.A.C. § 17.0114 (a)(10)) – The Act's location in Chapter 90 with the medical professions is no accident. The regulatory scheme under the Act specifically contemplates coordination of dietary and nutritional counseling with other health care services. Subject to a client's consent, a licensee must provide information to the client's physician "where a client's nutritional status indicates a change in health status." In contrast, plaintiff's counseling and advice takes place independently of – and sometimes in conflict with – treatment and advice from physicians.

- **Assuming responsibility and accountability for competence in practice** (21 N.C.A.C. § 17.0114 (a)(5), (13)) – Each time a licensed dietitian renders advice, he puts his license and his livelihood on the line and he is accountable for the consequences of his advice. In contrast, if one of plaintiff's many "friends" suffered adverse health consequences as a result of following plaintiff's individualized advice, plaintiff would likely be "just a blogger" with no responsibility or accountability.

- **Maintaining confidentiality** (21 N.C.A.C. § 17.0114 (a)(8)) – Plaintiff's website contains a "Privacy Page" that discloses the type of information collected from website users. However, there is no commitment to preserving the confidentiality of persons seeking personal advice. Unlike clients of a licensed dietitian, plaintiff's diet coaching clients and "internet friends" have no assurance that their information will not later be published on plaintiff's website.

- **Refusing to perform services where not qualified** (21 N.C.A.C. § 17.0114 (a)(9)) – Licensees under the Act are obligated to refrain from performing services "which the licensee knows or has reason to know that he or she is not qualified to perform." However, nothing constrains plaintiff from attempting to answer any inquiry posed to him regardless of his knowledge and qualifications.

In short, as evidenced by the very circumstances at issue in this case, the regulation and licensing of dietitians and nutritionists advances a compelling governmental interest and is well within the state's constitutional powers.

**B.** **The Regulation of Dietitians and Nutritionists Does Not Violate The *First Amendment* Does Not Violate The *First Amendment*.**

As explained in Section II.A., *supra*, the regulation and licensing of professions – including dietetics/nutrition – is a constitutional exercise of the state's powers. The remaining question raised here, then, is whether an otherwise permissible professional regulation becomes subject to *First Amendment* scrutiny because the regulated conduct includes spoken or written advice. The United States Court of Appeals for the Fourth Circuit has considered this question and answered with a resounding, "No."

**1.** ***Professional Regulations Are Not Subject To First Amendment Scrutiny Simply Because They Regulate Activities That Include Communications.***

"Professional regulation is not invalid, nor is it subject to *first amendment* strict scrutiny, merely because it restricts some kinds of speech." *Bowman,* 860 F.2d at 604 (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456-57 (1978) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.")); *Lowe v. S.E.C.*, 472 U.S. 181, 228 (1985) (White, J., concurring) ("The power of government to regulate the professions is not lost whenever the practice of a profession entails speech."). Indeed, "[a] statute that governs the practice of an occupation is not unconstitutional as an abridgment of the right to free speech, so long as 'any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation.'" *Bowman*, 860 F.2d at 604 (quoting *Underhill Assoc. v. Bradshaw*, 674 F.2d 293, 296 (4th Cir. 1982)).

Of course, states do not have carte blanche to limit all speech through professional regulations. The key is determining the "point where regulation of a profession leaves off and prohibitions on speech begin." *Lowe*, 472 U.S. at 230, 232 (White, J., concurring). The Fourth Circuit has followed the "sound, specific guidelines" from Justice White's concurrence in *Lowe*

14

in finding that point. *Bowman*, 860 F.2d at 604. According to Justice White, the distinction lies in whether there is a "personal nexus between professional and client." *Lowe*, 472 U.S. at 232 (White, J., concurring). In other words, a person "who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession." *Id.* Requiring these individuals to obtain a license does not limit free speech subject to *First Amendment* scrutiny. *Id.* Only when this "personal nexus" is lacking must a regulation satisfy the level of scrutiny that the *First Amendment* demands. *Id.*

Relying heavily on Justice White's concurrence, the Fourth Circuit in *Bowman* analyzed a statute prohibiting unlicensed accountants from using certain terms in documents they prepared for their clients, including giving an "assurance" as defined by statute and describing the "principles" and "standards" related to preparation of financial statements. 860 F.2d at 603. Noting that the non-CPAs "exercise their professional judgment in making individualized assessments of each client's financial situation," the *Bowman* court held that the statute – which "restrict[ed] only accountants' communications with and on behalf of their clients, as a means of regulating the professional activities of non-CPAs" – was a "permissible regulation of a profession, not an abridgment of speech protected by the *first amendment*." *Id.* at 604-05.

Last year, the Eleventh Circuit likewise relied on Justice White's concurrence – and the Fourth Circuit's *Bowman* decision – in holding that a Florida statute requiring interior designers to be licensed before practicing in a commercial setting was a professional regulation that "d[id] not implicate constitutionally protected activity under the *First Amendment*." *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011). In so holding, the *Locke* court stated, "There is a difference, for *First Amendment* purposes, between regulating professionals' speech to the public at large versus their direct, personalized speech with clients." *Id.* Because "Florida's license

requirement regulates solely the latter," the *First Amendment* did not apply. *Id.* Numerous other courts have similarly held that professional conduct, even conduct involving speech, can be regulated without violating the *First Amendment*. *See, e.g., Ohralik*, 436 U.S. at 456-59 (attorneys); *Bradshaw*, 674 F.2d at 296 (securities broker-dealers); *NAAP*, 228 F.3d at 1053-56 (psychologists); *Wilson v. State Bar*, 132 F.3d 1422, 1429-30 (11th Cir. 1998) (attorneys); *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1992) (attorneys).

### 2.      *The Act Is A Constitutional Regulation Of Professional Services.*

Like the professional regulations in *Bowman* and *Locke*, the Act merely limits what professional services an individual may provide without a license. The challenged Act requires a license to practice "dietetics/nutrition." According to the Act, a dietitian's "primary function" includes assessing and evaluating the nutritional needs of his or her clients, counseling clients on nutrition-related issues and establishing goals and objectives based on his or her client's individualized health needs. N.C. Gen. Stat. § 90-352(2), (4). Dietitians – like lawyers, doctors, accountants and interior designers – thus "exercise[] judgment on the client's behalf according to the client's particular needs and circumstances." *See Locke v. Shore*, 682 F. Supp. 2d 1283, 1292 (N.D. Fla. 2010). Because of the "personal nexus" between a dietitian and his client, the Act's requirement that dietitians be licensed "is a professional regulation, and its effect on speech is incidental. *Locke*, 682 F. Supp. 2d at 1292 (quoting *Lowe*, 472 U.S. at 232 (White, J., concurring). The Act's license requirement is therefore not subject to *First Amendment* scrutiny." *See id.*

Arguing to the contrary, plaintiff has asked the Court to disregard *Bowman* – which is controlling, on-point precedent – and other persuasive cases because of Supreme Court decisions from 2010 and 2011 that do not even deal with professional regulations or licensing. (*See* D.E. # 4-1 at 15-20 & D.E. # 18 at 11-13) (discussing *United States v. Stevens*, 130 S. Ct. 1577 (2010);

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010); and *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011))  Notwithstanding the Board's reliance on other authority – including the Eleventh Circuit's decision from last year in *Locke* – plaintiff criticizes the Board's reliance on *Bowman*, asserting that "the Board would have this Court believe that First Amendment jurisprudence stopped developing in 1988."  (D.E. # 18 at 11)  According to plaintiff, "*Bowman* is in serious – likely fatal – tension with intervening Supreme Court precedent."  (*Id.* at 12)  The Fourth Circuit disagrees.  Just last month, the Fourth Circuit reaffirmed the principle articulated in *Bowman*:

> The Supreme Court has not recognized the notion that 'professional speech,' *unconnected to state regulation or licensing*, is entitled to less protection under the First Amendment.  *We have, however, recognized that the government may regulate the professions and, as necessary to serve the state's interest in such regulation, so regulate the professionals' speech.*

*Greater Balt. Ctr.*, 2012 U.S. App. LEXIS 13157, at *26 n.3 (emphasis added) (citing *Bowman*, 860 F.2d at 603-05 (noting that "governmental regulation of the professions is constitutional if the regulations have a rational connection with the applicant's fitness or capacity to practice the profession")).[4]  Under controlling precedent in this circuit (and consistent with persuasive authority from other circuits), the complaint therefore fails to state a cognizable *First Amendment* claim.

---

[4] Significantly, the Fourth Circuit in *Greater Baltimore Center* acknowledged and cited the United States Supreme Court's decisions in *Sorrell* and *Stevens* on which plaintiff relies, yet found no tension – "fatal" or otherwise – between those decisions and *Bowman*.  *See* 2012 U.S. App. LEXIS 13157, at *28, *58-59.  Similarly, the Eleventh Circuit decided *Locke* after *Stevens* and *Holder*, yet noted no tension between those decisions and the principles articulated in Justice White's concurrence in *Lowe* and the Fourth Circuit's decision in *Bowman*.

17

III. **PLAINTIFF HAS NOT ALLEGED FACTS SUFFICIENT TO SUPPORT A CONCLUSION THAT HE HAS BEEN SUBJECTED TO CONTENT-BASED RESTRICTIONS ON HIS SPEECH.**

Throughout the complaint, plaintiff alleges that the Act, the Regulations and the Board have restricted his speech based on its content. (*See, e.g.,* Compl., ¶¶ 108-09, 113, 116, 123, 126, 130) However, the Act makes no reference to the content of any speech, and individuals must become licensed before practicing dietetics/nutrition regardless of any message they wish to convey. *See generally* N.C. Gen. Stat § 90-350, *et seq.* Indeed, the Regulations specifically require licensees to "interpret controversial information without personal bias, *recognizing that legitimate differences of opinion exist*." 21 N.C.A.C. § 17.0114(3) (emphasis added). In seeking to "safeguard the public health, safety and welfare," *see* N.C. Gen. Stat. § 90-351, the Act is by definition "content neutral" because "it is justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quotation marks and emphasis omitted). Instead, consistent with *Bowman, supra,* the Act and the Regulations merely govern the requirements for the practice of dietetics/nutrition in North Carolina

Similarly, to the extent the Act has been applied to plaintiff at all through the informal Comments, it has been applied without regard to the content of his speech. The Comments make no mention of the topics or messages discussed by plaintiff. Instead, the Comments identify instances where he arguably took "the affairs of a client personally in hand" by offering personalized diet advice based on a "client's individual needs and circumstances." *See Lowe*, 472 U.S. at 232 (White, J., concurring); *Bowman*, 860 F.2d at 604; *Locke*, 682 F. Supp. 2d at 1291-92. Notably, there are no comments on portions of the website where plaintiff discusses generally his "low carb paleo style meal plan," his "Diabetic Nutrition Chart," his recommendations regarding which foods to eat and which ones to avoid, his belief that readers

should find doctors who support the Paleolithic diet he supports, his exercise regimen or his beliefs regarding the risks of over training. (Compl., Ex. 1 at 8, 10-12) Ultimately, even plaintiff concedes that the "general thrust" of the Comments is that he could "convey general information about diet, but not . . . his opinion about what any particular person ought to eat because doing so involves a personal assessment and personal counseling, which only government-licensed dietitians may legally conduct." (*Id.*, ¶ 73)

Faced with the consistently content-neutral language in the Act, the Regulations and the Comments, plaintiff resorts to contending that the Act is a "content-based restriction" because his speech is deemed "illegal based on the fact that it involved advice about diet and not advice about any other topic such as auto mechanics, taking the SATs, or marriage." (Compl., ¶¶ 108, 118) This desperate attempt to disguise his objection to professional regulations as a challenge to content-based censorship depends upon confusing content with context. By plaintiff's tortured logic, every regulation affecting a profession where the communication of information or advice is incidental to providing the professional service would be "content-based" and subject to *First Amendment* scrutiny.

Whether it be the regulations governing doctors (§ 90-9.1), lawyers (§ 84-4), accountants (§ 93-2), psychologists (§ 90-270.16), pharmacists (§ 90-85.15) or any of the numerous other regulated professions in which communications are part of providing the professional service, plaintiff would have this Court find such regulations to be content-based because they govern advice about medical care, law, accounting, psychology or medicines as opposed to "auto mechanics, taking the SATs, or marriage." Not only does this theory strain logic to the breaking point, but it flies directly in the face of the cases cited herein where courts considered and affirmed the constitutionality of statutes regulating a particular profession, without any suggestion that such statutes impose content-based restrictions merely because they apply only to

providing information or advice in one particular profession. *See, e.g. Bowman, supra; Locke, supra; Ohralik, supra; Bradshaw., supra; NAAP, supra; Wilson, supra; Lawline, supra.*

In short, nothing in the Act prohibits plaintiff from sharing his opinion on the Paleolithic diet, diabetes, the "diabetic medical establishment" or any other topic. *See generally* N.C. Gen. Stat § 90-350, *et seq.* Indeed, plaintiff has been shouting his opinions on those topics from the virtual "rooftop" of an internet blog and nobody has told him to stop. Nor does the Act prevent licensed dietitians from designing and recommending Paleolithic-based diets to their diabetic clients. Instead, the Act merely serves to ensure that persons assessing, counseling and providing individualized dietary advice – regardless of the content of such advice – satisfy the requirements for licensure. Accordingly, plaintiff has not been subjected to content-based censorship, and the Act does not infringe on rights protected under the *First Amendment*.

## CONCLUSION

To the extent plaintiff's claims are even properly before this Court at this time, they fall squarely within existing Fourth Circuit precedent holding that a statute such as the Act does not violate the right to freedom of speech under the *First Amendment*. The Court should decline plaintiff's invitation to reject this circuit's binding authority and should grant the Board's motion to dismiss plaintiff's claims with prejudice.


Respectfully submitted, this the 27th day of July, 2012.

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

*/s/ W. Clark Goodman*
W. Clark Goodman
NC Bar Number 19927
Email: cgoodman@wcsr.com
James S. Derrick
N.C. Bar Number 39632
Email: jderrick@wcsr.com
301 South College Street, Suite 3500
Charlotte, North Carolina 28202
Telephone No.: (704) 331-4981
Facsimile No.: (704) 338-7808

**Of Counsel**

JORDAN PRICE WALL GRAY JONES
& CARLTON, PLLC

Henry W. Jones, Jr.
N.C. Bar No. 8343
Email:   hjones@jordanprice.com
Lori P. Jones
N.C. Bar No. 32872
Email: ljones@jordanprice.com
1951 Clark Avenue
Raleigh, North Carolina 27605
Telephone: (919) 828-2501
Fax: (919) 831-4484

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 27th day of July, 2012, the foregoing **DEFENDANTS'
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFF'S COMPLAINT** was filed with the Clerk of Court using the CM/ECF system,
which will automatically send notification of such filing and serve counsel for all parties.


*/s/ W. Clark Goodman*
W. Clark Goodman (N.C. State Bar. No. 19927)